506

*In re* ESTATE OF STANLEY CIESIOLKIEWICZ, Deceased (Lawrence E. Cecil *et al.*, Petitioners-Appellants, v. Daniel M. Cecil, Indiv. and as Co-Executor of the Instrument purporting to be the Last Will and Testament of Stanley Ciesiolkiewicz, Deceased, *et al.*, Respondents-Appellees).

First District (2nd Division) No. 1—91—1823

Opinion filed March 2, 1993.—Rehearing denied April 22, 1993.

John J. Corbett, Ltd., of Chicago (John J. Corbett and Scott M. Annes, of counsel), for appellants.

Jenner & Block, of Chicago (Gregory S. Gallopoulos, of counsel), and Kamensky & Rubinstein, of Lincolnwood (Benton C. Strauss, of counsel), for appellees.

JUSTICE SCARIANO delivered the opinion of the court:

Petitioners, the sole heirs at law besides co-respondent Daniel M. Cecil (Daniel), brought this action to contest the validity of the last will and testament of the decedent, Stanley Ciesiolkiewicz. Count I of the petition alleges that decedent lacked the testamentary capacity to execute the will. Count II claims that the will is invalid because Daniel, decedent's nephew, the sole beneficiary and co-executor under the will, exerted undue influence over decedent. Petitioners requested a jury trial on both counts; the trial court, however, granted respondents' motion for summary judgment as to both counts, and petitioners appeal from that judgment.

In support of their motion for summary judgment, respondents submitted affidavits from Daniel and Alfreda Farber (Farber), co-executors of the will; Herman Beyer (Beyer) and Marianne Brown (Brown), the two witnesses to the will; and Edward Krzyminski (Krzyminski), the attorney who prepared it. These affidavits set forth the

following facts. Decedent, suffering from acute leukemia and diabetes mellitus, was brought to the emergency room of Mercy Hospital and Medical Center around midnight on May 14, 1987. After examination by hospital personnel, he was admitted as an inpatient and hospitalized until May 22. Decedent returned to the hospital on May 28 and died there on June 2.

In early May 1987, decedent hired Krzyminski to draft a deed conveying a parcel of real estate which he owned to Daniel. Krzyminski had known decedent socially for about one year before he requested his services. Krzyminski also had performed some legal services for Daniel concerning an accident case in April 1987. In addition, Krzyminski and Daniel worked for the same company; Krzyminski was an officer while Daniel was a salesman.

Krzyminski was in the process of preparing the deed for decedent when Daniel, on either May 15 or 16, informed him that his uncle was hospitalized and wanted to discuss other legal matters with Krzyminski. Krzyminski brought the finished but unsigned deed with him when he visited decedent at the hospital on May 16. When he arrived at the hospital, Krzyminski found Daniel and Farber in the room along with decedent. After decedent reviewed and executed the deed, he told Krzyminski that he wanted him to prepare his will; however, before discussing the matter any further decedent asked Daniel to leave the room, which he did. At decedent's request, Farber remained in the room.

After Daniel left the room, Krzyminski began interviewing decedent, taking notes detailing the provisions decedent asked to have included in his will. Decedent told him that he did not have a prior will and gave him a detailed account of his property, all of which he desired to bequeath to Daniel. At this point, Farber asked decedent if he wanted to leave any of his property to anyone other than Daniel; decedent rejected this suggestion and reiterated his desire to bequeath everything to Daniel. Krzyminski stated that he later drafted the will, following decedent's instructions. He did not disclose the terms of the will to anybody except his wife, who also served as his part-time secretary.

On May 18, 1987, Krzyminski returned to the hospital with the completed will for decedent's review. Decedent initially read the will to himself, and then he reviewed it paragraph by paragraph with Krzyminski. After Krzyminski was satisfied that decedent understood the terms of the will, decedent told him that he wanted to sign it. Krzyminski then asked some members of the hospital staff if they would serve as witnesses, but he was informed that hospital policy

prohibited employees from attesting to patients' wills. Krzyminski suggested to decedent that two mutual friends, Beyer and Brown, could witness the execution of the will. Decedent concurred, and Krzyminski arranged for Beyer and Brown to come to the hospital.

When the witnesses arrived later that day, they found decedent in good spirits, and they talked about business and social matters. Eventually, the group began to execute the will. Decedent identified the will, and Beyer and Brown watched him sign each page of it. Thereafter, Beyer and Brown signed the will in decedent's presence and in the presence of each other, and Krzyminski then notarized the will.

Both of the witnesses attested that decedent was mentally alert, that he signed the will with his own hand, that he acted deliberately and without prompting, and that he knew exactly what he was doing. Krzyminski, Beyer and Brown all stated that Daniel was not present when the will was executed, and Daniel also stated in his affidavit that he knew nothing of the contents of the will until after his uncle's death.

With their reply to respondents' motion for summary judgment, petitioners submitted affidavits of medical personnel which elicited the following facts. Erica Heit, M.D., stated that when she examined him on May 15, decedent "had an onset of mental confusion [the day before] with progressive confusion and the onset of incontinence." She concluded that based on her examination of decedent, he was, at that time, "mentally impaired and experiencing acute mental status changes such that he could not make decisions for himself that could be relied upon by others."

Keith Meredith Ashby, M.D., stated that when he examined decedent on May 15, he was "exhibiting acute mental status changes with focal seizure activity *** [and] experienc[ing] progressive confusion, and a new onset of incontinence." Dr. Ashby concluded that decedent "was mentally impaired and experiencing mental status changes."

Pedro Lopez, M.D., stated that throughout decedent's period of hospitalization between May 15 and May 22, decedent "exhibited varying degrees of mental impairment." Dr. Lopez also related that one of his nurse's notes indicated that decedent had pulled his catheter tube from his bladder through his penis with the inflated balloon still intact. He opined that "this is something a patient who is free of mental impairment would not do." Finally, Dr. Lopez stated that decedent "was mentally impaired and experiencing mental status changes such that he could not competently make decisions for himself that could be relied upon by others."

Susan Mason, R.N., stated that during decedent's week-long stay in the hospital, he was "disoriented from time to time" and that "his mental status was unreliable." She also indicated that during the day on which decedent's will was executed, his "judgment was clouded and he was unable to care for himself." Mason also stated that about three or four days after decedent was hospitalized, Daniel asked her rather adamantly to witness decedent's will. She stated that during some periods during the day on which the will was signed, Daniel was in the room with his uncle; she also stated, however, that a will was never mentioned while she and Daniel were present in the room.

After considering these affidavits and hearing oral argument, the trial court granted respondents' motion for summary judgment on both counts of the petition. Petitioners now appeal that decision.

I

The purpose of summary judgment is to determine if there are any genuine issues of triable fact. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871.) Although the use of a summary judgment procedure is encouraged as an aid in the expeditious disposition of a lawsuit (see *In re Estate of Jensik* (1962), 34 Ill. App. 2d 130, 135, 180 N.E.2d 740, 743 (summary judgment encouraged where appropriate in probate matters)), it is a drastic means of disposing of litigation and should be used only when the right of the moving party is clear and free from doubt. *Loyola Academy v. S & S Roof Maintenance, Inc.* (1992), 146 Ill. 2d 263, 271, 586 N.E.2d 1211, 1215.

Because it is such a drastic measure, a motion for summary judgment should be granted only when the pleadings, depositions, admissions, and affidavits on file, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005(c); *Balla v. Gambro, Inc.* (1991), 145 Ill. 2d 492, 508, 584 N.E.2d 104, 112.) A genuine issue of material fact exists not only when the facts are in dispute, but also where reasonable persons could draw different inferences from undisputed facts. (*Loyola Academy*, 146 Ill. 2d at 272, 586 N.E.2d at 1215; *In re Estate of Jessman* (1990), 197 Ill. App. 3d 414, 419, 554 N.E.2d 718, 720.) Thus, summary judgment is proper only where undisputed facts admit but one reasonable inference. (*Jessman*, 197 Ill. App. 3d at 419, 554 N.E.2d at 720.) A trial court may not weigh evidence set forth in opposing affidavits, thereby denying a right to a jury trial (*In re Estate of Hoover* (1992), 226 Ill. App. 3d 422, 429, 589 N.E.2d 899, 905), and we have consistently warned that summary judgment is particularly inappropriate where the infer-

ences sought to be drawn deal with questions of motive, intent or subjective feelings and reactions. See, *e.g., Jessman,* 197 Ill. App. 3d at 419, 554 N.E.2d at 721; *Montgomery Ward & Co. v. Wetzel* (1981), 98 Ill. App. 3d 243, 247, 423 N.E.2d 1170, 1174; *Schuster v. East St. Louis Jockey Club, Inc.* (1976), 37 Ill. App. 3d 483, 487, 345 N.E.2d 168, 172.

The burden of establishing that there are no genuine issues of material fact is on the moving party. (*Becovic v. Harris Trust & Savings Bank* (1984), 128 Ill. App. 3d 107, 119, 469 N.E.2d 1379, 1387.) In determining whether the moving party has met that burden, the court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. (*Loyola Academy,* 146 Ill. 2d at 271, 586 N.E.2d at 1215; *Purtill,* 111 Ill. 2d at 240, 489 N.E.2d at 871.) Because this court must review summary judgments *de novo* (*Myers v. Health Specialists, S.C.* (1992), 225 Ill. App. 3d 68, 72, 587 N.E.2d 494, 497, *appeal denied* (1992), 145 Ill. 2d 635, 596 N.E.2d 630), we must analyze the facts that were before the trial court to determine whether it properly granted summary judgment on both counts of the petition.

■ Count I of the petition claims that decedent lacked the testamentary capacity to execute a valid will. It is well established that the law presumes every person sane until the contrary is proved; thus, the burden of proof rests on the party who asserts the lack of testamentary capacity. (*Shevlin v. Jackson* (1955), 5 Ill. 2d 43, 47, 124 N.E.2d 895, 897.) Testamentary capacity requires that the person making the will have sufficient mind and memory to understand the particular business in which he is engaged, to know the natural objects of his bounty, to know the character and extent of his property, and to make disposition of said property according to a plan formed in his own mind. *Butler v. O'Brien* (1956), 8 Ill. 2d 203, 210, 133 N.E.2d 274, 278; *In re Sutera* (1990), 199 Ill. App. 3d 531, 536, 557 N.E.2d 371, 374.

Petitioners assert that the affidavits submitted by hospital personnel who observed decedent shortly before he executed the will illustrate that decedent lacked the mental capacity to do so. They claim that this evidence clearly contradicts the affidavits of those present during the execution of the will in which they stated that decedent was of sound mind, thus raising a genuine issue of material fact. Respondents argue that the affidavits submitted by petitioners do not contradict theirs because they do not necessarily indicate that decedent was incompetent to make a will, and that they are irrelevant to decedent's state of mind *at the precise time* the will was executed.

■ Respondents' first argument is meritless. The doctors and nurses who treated decedent all opined that decedent was mentally impaired in such a way that he could not competently make decisions for himself that could be relied upon by others. Assuming these facts to be true, as we must at this juncture, if decedent was not mentally competent to make decisions for himself, it is entirely possible that he did not know the nature of his bounty, the character of his property, or his plan as to how he wanted to dispose of that property. Accordingly, the affidavits of the medical personnel were directly relevant to the question of whether decedent lacked the testamentary capacity to execute a will. See, *e.g., In re Estate of Dossett* (1987), 159 Ill. App. 3d 466, 473, 512 N.E.2d 807, 811 (evidence that testator was "very weak" and very confused, as well as the fact that she was of "diminished mental capacity," was sufficient to send case to jury for determination of testamentary capacity).

■ The respondents' second assertion is equally baseless. It is well recognized that evidence of the mental condition of the testator a reasonable time before or after the making of a will is relevant to show his mental condition at the time of the execution of the instrument (*Butler*, 8 Ill. 2d at 211, 133 N.E.2d at 278; *Peters v. Peters* (1941), 376 Ill. 237, 242, 33 N.E.2d 425, 427; *Central Bank v. Ziaee* (1989), 188 Ill. App. 3d 936, 949, 544 N.E.2d 1121, 1130, *appeal denied* (1989), 128 Ill. 2d 662, 548 N.E.2d 1067; *Manning v. Mock* (1983), 119 Ill. App. 3d 788, 805, 457 N.E.2d 447, 457), especially where the mental condition is of a continuous nature. (*Peters*, 376 Ill. at 243, 33 N.E.2d at 427; accord *Ziaee*, 188 Ill. App. 3d at 949, 544 N.E.2d at 1130.) Our supreme court has found to be relevant proof of the mental condition of the testator two years prior to the execution of the will. *Voodry v. Trustees of the University of Illinois* (1911), 251 Ill. 48, 51, 95 N.E. 1034, 1035; accord *Mitchell v. Van Scoyk* (1953), 1 Ill. 2d 160, 176, 115 N.E.2d 226, 235; *Manning*, 119 Ill. App. 3d at 805, 457 N.E.2d at 457.

In the case *sub judice*, the doctors and nurses who submitted affidavits on behalf of the petitioners observed decedent a few days before the execution of the will. In. fact, one nurse stated that on the day the will was executed, she noticed that decedent's "judgment was clouded." Therefore, the facts presented by the hospital staff were indisputably of sufficient proximity to the execution of the will to be relevant to the question of decedent's testamentary capacity.

In sum, both parties submitted affidavits that contain relevant facts which completely contradict each other concerning the question of decedent's testamentary capacity at the time the will was executed;

it is therefore quintessentially a function of the fact finder to resolve this conflict. Consequently, we reverse the trial court's grant of summary judgment on count I of the petition.

## II

■ Count II of the petition asserts that the will is invalid because Daniel procured it by exerting undue influence over decedent. For undue influence to invalidate a will, it must operate to prevent a testator from exercising his free will in the disposition of his estate. (*Breault v. Feigenholtz* (1973), 54 Ill. 2d 173, 181, 296 N.E.2d 3, 9.) The undue influence must cause the testator to make a disposition of property which is not the testator's free and voluntary act, but which is rather the product of another person. (*Hoover*, 226 Ill. App. 3d at 427, 589 N.E.2d at 903.) The influence may have been exerted at any time, but it must have been directly connected with the execution of the will and in operation at the time the will was made. *In re Estate of Julian* (1991), 227 Ill. App. 3d 369, 376, 592 N.E.2d 39, 44.

■ The party asserting that a will was executed as a result of undue influence must establish the following elements to raise such a presumption: (1) a fiduciary relationship between the testator and a person who receives a substantial benefit under the will; (2) a testator in a dependent situation in which the substantial beneficiaries were in dominant roles; (3) a testator who reposed trust and confidence in such beneficiaries; and (4) a will prepared or procured and executed in circumstances wherein such beneficiaries were instrumental or participated. *Redmond v. Steele* (1955), 5 Ill. 2d 602, 609-10, 126 N.E.2d 619, 624; *Tidholm v. Tidholm* (1945), 391 Ill. 19, 25, 62 N.E.2d 473, 476; *Julian*, 227 Ill. App. 3d at 376, 592 N.E.2d at 44; *Jessman*, 197 Ill. App. 3d at 419-20, 554 N.E.2d at 721.

In the case at bar, petitioners claim that the affidavits submitted by both parties, when looked at in the light most favorable to them, establish all four elements necessary for a presumption of undue influence. Respondents reply that the evidence, even when viewed in the light most favorable to petitioners, fails to establish that Daniel was in a fiduciary relationship with decedent or that he procured or participated in the execution of the will. Because we decide the case on the former ground, we have no occasion to reach the latter.

■ A fiduciary relationship is established in the undue influence context where there is a *special confidence* reposed in one who, by reason of such confidence, must act in good faith and with due regard to the interests of the person reposing that special confidence. (*In re Estate of Osborn* (1984), 128 Ill. App. 3d 453, 455, 470 N.E.2d 1114,

1117.) This relationship " 'may exist as a matter of law between attorney-client, guardian-ward, trustee-beneficiary, and the like, or it may be the result of a more informal relationship—moral, social, domestic or even personal in its origin. [Citations].' " *Osborn*, 128 Ill. App. 3d at 455, 470 N.E.2d at 1117, quoting *Swenson v. Wintercorn* (1968), 92 Ill. App. 2d 88, 100, 234 N.E.2d 91, 97.

Petitioners assert that respondents concede that a fiduciary relationship existed between Daniel and decedent because they stated in their answer that he "reposed trust and confidence" in Daniel. We disagree. While this admission may satisfy petitioners' burden to show that decedent reposed trust and confidence in Daniel under the third prong of an undue influence claim espoused above, it is insufficient to establish the fiduciary relationship, or the "special confidence," element of the cause of action. This point was emphasized in *Sterling v. Dubin* (1955), 6 Ill. 2d 64, 126 N.E.2d 718, where our supreme court held that the primary beneficiary was not in a fiduciary relationship with the decedent even though she retained his trust, was his private secretary for a long period of time, had an illicit sexual relationship with him, and handled his financial affairs while he was in the hospital. *Sterling*, 6 Ill. 2d at 71-72, 126 N.E.2d at 722-23.

In the case at bar, petitioners point to no evidence from which we can deduce that Daniel was in a relationship of "special confidence" with decedent. That Daniel was his nephew and that decedent trusted him are not enough; there must be a factual basis in the record from which a reasonable inference can be drawn that Daniel was in a special relationship with decedent such that he was required to act with good faith and in the interest of decedent. Since the record here is devoid of such evidence, we hold petitioners could not, as a matter of law, establish that Daniel procured the will by exerting undue influence over decedent.

For all of the foregoing reasons, we reverse the trial court's grant of summary judgment as to count I (testamentary capacity) of the petition, and affirm the court's grant of summary judgment in favor of respondents as to count II (undue influence) of the petition.

Affirmed in part; reversed in part and remanded.

McCORMICK, P.J., and DiVITO, J., concur.